UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| Valerie Soto, Plaintiff, v. Sweet Home Belmont, et al., Defendants. | Case No. 2:22-cv-00632-BNW **ORDER** |

## I. INTRODUCTION

The sole surviving claim is wrongful death stemming from the death of Plaintiff's mother, Rosemary Mactier, at Sweet Home Belmont, a licensed residential facility. Ms. Mactier was admitted to SHB on April 16, 2020, as a hospice resident. She was found unresponsive and pronounced dead on April 20, 2020.

Before this Court is Plaintiff Valerie Soto's Motion to Strike Defendant Sweet Home Belmont's (SHB) Answer or, in the Alternative, for an Adverse Inference Instruction as a Sanction for Spoliation of Evidence. ECF No. 121. SHB responded, and Plaintiff replied. ECF Nos. 127, 128.

For the reasons stated below, this Court grants, in part, Plaintiff's motion on the spoliation matter. ECF No. 121.

## II. BACKGROUND

The motion on spoliation concerns missing records of Ms. Mactier's stay that SHB. As explained below, the records in question can be divided into two categories: (1) the complete resident file which includes the "HCQC binder" and the "hospice binder" and (2) a personal diary. SHB has produced certain records, but Plaintiff argues the complete resident file and the personal diary are missing. It is undisputed that NAC 449.2749 required SHB to maintain Rosemary's resident file, in a locked, fire-resistant location, for at least five years after she left the facility.

A court has two sources of authority to sanction a party for spoliation of evidence: its inherent authority and Federal Rule of Civil Procedure 37(e). *Martin v. Smith's Food & Drug Ctrs., Inc.*, No. 2:22-cv-00833-APG-DJA, 2024 WL 3084737, at *3 (D. Nev. June 21, 2024) (citing *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006)). Rule 37(e) governs spoliation of electronically stored information and appears to foreclose inherent-authority sanctions as to ESI, but inherent-authority sanctions remain available for physical evidence. *Id.*

The party requesting spoliation sanctions bears the burden of establishing the elements of a spoliation claim, *Martin*, 2024 WL 3084737, at *4, by a preponderance of the evidence, *LaJocies v. City of N. Las Vegas*, No. 2:08-cv-00606-GMN-GWF, 2011 WL 1630331, at *1 (D. Nev. Apr. 28, 2011). The threshold question is whether evidence was altered or destroyed. *Martin*, 2024 WL 3084737, at *4. If it was, the movant must further show that (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the evidence was relevant to a party's claim or defense such that a reasonable trier of fact could find it would support that claim or defense. *Id.*

Spoliation includes the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. *Id.* (citing *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002)). The duty to preserve begins when the party reasonably should have known the evidence is relevant to anticipated litigation. *Id.* (citing *Asfaw v. Wal-Mart Stores, Inc.*, No. 2:19-cv-01292-GMN-NJK, 2021 WL 2006283, at *1 (D. Nev. May 19, 2021)). The duty attaches as soon as a potential claim is identified. *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006).

The mere existence of a dispute does not necessarily mean a party should reasonably anticipate litigation or that the duty to preserve has arisen. *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 371 (S.D.N.Y. 2006). When a party should have reasonably anticipated litigation involves applying "a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011) (citing *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)).

As to the second factor, a party may be entitled to an adverse inference instruction based on spoliation even in the absence of a finding of bad faith. *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp*., 982 F.2d 363 n. 2 (9th Cir. 1992). Indeed, many courts in the Ninth Circuit hold that a "culpable state of mind includes negligence." *Soule v. P.F. Chang's China Bistro, Inc.*, No. 2:18-cv-02239-GMN-EJY, 2020 WL 959245, at * 4 (D. Nev. Feb. 26, 2020) (collecting cases).

"[A] party's motive or degree of fault in destroying evidence is relevant to what sanction, if any, is imposed." *In re Napster, Inc. Copyright Litig*., 462 F. Supp. 2d 1060, 1066-67 (N.D. Cal. 2006).

Bad faith is required is the sanction will be a dispositive one. *Stedeford v. Wal-Mart Stores, Inc*., No. 2:14-cv-01429-JAD-PAL, 2016 WL 3462132, at * 8 (D. Nev. June 24, 2016) (citing *Micron Tech., Inc. v. Rambus Inc*., 645 F.3d 1311, 1327 (Fed. Cir. 2011)). "The fundamental element of bad faith spoliation is advantage-seeking behavior by the party with superior access to information necessary for the proper administration of justice." *Id*.

"To warrant a rebuttable presumption, [the offending party] must have consciously disregarded its obligation to preserve" lost evidence. *McCabe v. Wal-Mart Stores, Inc.*, 2:14-cv-01987-JAD-CWH, 2016 WL 706191, at *3 (D. Nev. Feb. 22, 2016) (*citing Apple Inc. v. Samsung Elecs. Co., Ltd*., 888 F.Supp.2d 976, 998 (N.D. Cal. 2012). That is, a "[d]efendant must have willfully destroyed the evidence with intent to harm." *Demena v. Smith's Food & Drug Centers, Inc*., No. 2:12-cv-00626-MMD-CWH, 2012 WL 3962381, at *2 (D. Nev. Sept. 10, 2012).

Next, in order of severity, is an adverse-inference jury instruction through which the jury infers that the evidence destroyed by the offending party would have been unfavorable to that party. In other words, "[a]n adverse inference is an instruction to the trier of fact that evidence made unavailable by a party was unfavorable to that party." *Lewis v. Ryan*, 261 F.R.D. 513, 521 (S.D. Cal. 2009) (internal citation and quotation marks omitted).

In addition, when imposing an adverse inference instruction, some courts have required an analysis of the prejudice suffered by the non-spoliating party. *Moore v. Gilead Scis., Inc.*, No. C 07-03850 SI, 2012 WL 669531 at *5 (N.D. Cal. Feb. 29, 2012) (citing *Anheuser–Busch, Inc. v. Natural Beverage Distribs*., 69 F.3d 337, 348 (9th Cir. 1995)). "The prejudice inquiry looks to

whether the spoiling party's actions impaired the non-spoiling party's ability to go to trial or threatened to interfere with the rightful decision of the case." *Id.* (citing *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006)).

**A. The Parties' Positions**

**1. Plaintiff's Motion**

Plaintiff moves to strike SHB's answer or, in the alternative, for a rebuttable presumption or adverse-inference instruction. Plaintiff argues that SHB had an obligation to preserve Rosemary's records under NAC 449.2749, which requires a licensed group home to maintain a file for each resident for at least five years after the resident permanently leaves the facility. Because Ms. Mactier died on April 20, 2020, Plaintiff argues SHB was obligated to retain her file until at least April 20, 2025—well after this litigation was filed.

Second, Plaintiff argues that SHB destroyed or lost the evidence with a culpable state of mind. She contends that SHB's failure to preserve and protect the file as NAC 449.2749 required amounts to extreme recklessness. Plaintiff separately argues that the assistant manager's destruction of her own memoranda was intentional.

Third, Plaintiff argues that the missing records are relevant and their loss extremely prejudicial. Plaintiff contends the records are the only source of evidence bearing on Ms. Mactier's condition, her deterioration, the care she received, the identity of her caregivers, and contacts with Infinity Hospice. She also argues those records would have answered whether and when hospice was contacted and whether SHB should have summoned emergency medical attention.

**2. SHB's Response**

First, SHB argues it had no duty to preserve because it had no notice of pending or reasonably foreseeable litigation. SHB concedes it was obligated under NAC 449.2749 to retain the file for five years but argues that administrative regulations are guidelines and do not function as litigation-hold obligations.

Second, SHB argues that even if a duty existed, Plaintiff cannot show a culpable state of mind. Defendant contends that Plaintiff's own "extreme recklessness" characterization falls short of the bad faith required to strike an answer. As to an adverse inference, SHB argues that where

evidence becomes unavailable for an innocent reason an inference may be rejected and that Plaintiff has shown only that the managing member left the records at the facility upon selling her interest, with no evidence why the successor owners failed to preserve them.

Third, SHB argues Plaintiff suffered no prejudice. SHB contends that the best evidence of Ms. Mactier's care comes from Infinity Hospice's disclosed records. It further argues that Plaintiff's description of the contents of the missing records is speculative. According to SHB, the information Plaintiff seeks is already reflected in other disclosures.

**3. Plaintiff's Reply**

As a threshold matter, Plaintiff points out SHB does not dispute that the records at the facility were lost or destroyed.

Plaintiff also argues that SHB's concession of its NAC 449.2749 retention obligation satisfies her burden to show a preservation duty. In the alternative, Plaintiff argues SHB should have anticipated litigation given the police, licensing-board, and coroner investigations.

Regarding culpable state of mind, Plaintiff argues that disregard of the NAC is tantamount to a conscious disregard of SHB's obligations. She also argues that Miyeon Lee admitted intentional destruction of her memoranda.

On prejudice, Plaintiff argues she has offered plausible, concrete suggestions of what the missing records would have shown. Specifically, that the records at issue—which were required to be reduced to writing by SHB's own policies and procedures—would likely show how Ms. Mactier's condition rapidly deteriorated during those four days and what, if anything, SHB did in response to her changed condition.

**B. Findings of Fact**

**1. Michelle Lee**

Michelle Lee (Michelle) was the managing member of SHB in April 2020. Tr at 7. She was responsible for keeping all resident records at the facility. Tr at 10. There was only one set of records maintained by SHB—she did not scan or make any copies of records and did not have an off-site storage facility. Tr at 17.

She sold and transferred SHB on June 28, 2021, to Elena Kealoha. Tr at 8. At that time, Michelle transferred all records to Elena Kealoha, including records pertaining to Ms. Mactier. Tr at 10-11, 60-61. The administrator of the facility at the time she transferred SHB was Nicole Croft, who now goes by Nicole Schmal. Tr at 12.

Michelle last saw documents pertaining to Ms. Mactier on June 28, 2021. Tr at 11-12. She remembers meeting with Ms. Kealoha on that day and discussing Ms. Mactier's situation and records pertaining to her. Tr at 123, 125. She told Ms. Kealoha that Ms. Mactier's daughter came to SHB about a year after Ms. Mactier passed and that the police had to be called because the daughter made a scene. Tr at 123.

When Michelle was in charge of SHB, the records pertaining to Ms. Mactier were inside the TV stand in a locked compartment. Tr at 11-12, 29-30. Michelle went back to SHB in May 2025 in connection with this litigation and did not see the records pertaining to Ms. Mactier. Tr at 13-14. She did not see the TV stand at that time either. Tr at 14.

Miyeon Lee (Miyeon) is Michelle's sister and was primarily responsible for Ms. Mactier's care. Tr at 18. Miyeon took quick notes regarding residents, including Ms. Mactier, so that she could orally report the residents' condition back to Michelle. Tr at 18-21, 127, ECF No. 121-3 at 6. In turn, Michelle would write down the information in the resident's official record. Tr at 28. The resident's official record would include "important information," which included the number of times individuals were turned over on the bed, etc. Tr at 28.

Miyeon's notes were scratch notes. Tr at 27. Michelle told Miyeon to get rid of those notes to avoid later confusion and because of HIPPA. Tr at 29, 86. Miyeon later told Michelle she regretted not having kept some of those notes. Tr at 33, 42.

**2. Nicole Schmal**

Nicole Schmal was the administrator for SHB in April 2020. She saw 2 binders pertaining to Ms. Mactier while she was in that role: (1) a Healthcare Quality Compliance (HCQC) binder and (2) a hospice binder. Tr at 50. The HCQC binder contained the residents' history and physical information, orders from hospice, etc. Tr at 51. If there was an incident with a resident, that report would also be in that binder. Tr at 51. The hospice binder contained records produced by and

placed there by hospice. Tr at 50-51. After a resident passes, the hospice binder is consolidated with the other file. Tr at 81, ECF No. 121-1 at 19. Caregiver notes are kept separate from those two binders and they do not necessarily become part of the HCQC binder. Tr at 51. Ms. Schmal went back to SHB in connection with this case in 2025 and did not see Ms. Mactier's records. Tr at 56. She believes the records got destroyed when SHB was sprayed as a result of a bedbug infestation. Tr at 57-59.

An incident report was prepared regarding Ms. Mactier as a result of a fall. Tr at 75-76. SHB also had a Medication Record Log for Ms. Mactier. Tr at 75. This Court does not credit Ms. Schmal's testimony that the only other records generated and/or kept at SHB in relation to Ms. Mactier would have been generated by Infinity Hospice. Tr at 76.[1]

Typically, after a resident passes the hospice binder is made part of the regular file and kept in a locked cabinet. Tr at 79.

**3. Elena Kealoha**

Ms. Kealoha is the current managing member of SHB. Tr at 90. There were specific policies and procedures in place at the time that Ms. Mactier passed in April 2020. Those included notifying a resident's physician if there was a change of condition with the resident and documenting with whom the employee spoke and the date and time of the conversation (Tr at 97-98, ECF No. 156 at Bates No. 0048).

When Ms. Kealoha took over SHB from Michelle, she remembers Michelle telling her that certain records, including those regarding Ms. Mactier, should be kept safe. Tr at 105-106. She kept those records under the TV cabinet. Tr at 106. She later looked for records regarding Ms. Mactier but did not locate any. Tr at 100, 104.

[1] This is based on Michelle's testimony that she included "important medical" information in the official record and that such information included the number of times someone was turned over in bed. Tr at 28. In addition, Ms. Schmal herself testified as to the existence of caregiver notes, although she did not know whether they would necessarily become part of the HCQC binder. Tr at 51. Lastly, Miyeon testified that she reported Ms. Mactier's changed condition to Michelle. Tr at 149. SHB's policies and procedures required Michelle to reduce Miyeon's oral report to written form. Tr at 97-98.

**4. Miyeon Lee**

Miyeon Lee worked at SHB between 2018 and December 30, 2022. Tr at 139. She was one of Ms. Mactier's caregivers. Tr at 140. She did not maintain the HCQC file as that was Michelle's responsibility. Tr at 141. She kept a "personal diary" with daily logs, which included residents' conditions. Tr at 141, 143. This "diary" included her personal feelings, and it is separate from any official record-keeping. Tr at 143. It did not include the information that she had to report to Michelle to include in the residents' file. Tr at 146-147. She got rid of these notes after she stopped working at SHB. Tr at 141.

She remembers that Ms. Mactier's condition changed and that she reported this orally to the owner and the hospice**.** Tr at 149. She wrote about Ms. Mactier's change in condition in her diary. Tr at 149.

**5. Miscellaneous Findings**

The furniture at SHB was disposed of after the place was infested with bed bugs. ECF No. 163 at Bates No. SUPP 002-021. The home was treated with chemicals around September-October 2021. ECF No. 163 Bates No. SUPP 087-92.

The Department of Health and Human Services conducted an investigation as a result of "a complaint investigation completed on [SHB] on 4/20/20 through 5/28/20." ECF No. 127-5 at Bates No.VS-000730. That report makes clear that the investigative report shall not be construed to prohibit a civil action under applicable federal, state, or local laws. *Id*.

Ms. Mactier's daily medication log is available. ECF No. 127-8 at Bates No. SOTO-CRNR 000577-0581. It is not clear what medications were provided on April 19, 2020. *Id*.

There is also a note regarding attempted call to Ms. Mactier's daughter on April 17, 2020.

The incident report regarding Ms. Mactier's' fall on April 18, 2020, is at ECF No. 127-9 at Bates No. CROCK 0459.

The record regarding Ms. Mactier's' discharge on April 20, 2020, (after she passed) is at ECF No. 127-10 at Bates No. IHC-MR 01908.

There is an absence of records concerning April 19, 2020.

## III. DISCUSSION

This Court will separate the record at play into three different categories: (1) the combined resident file (HCQC + hospice binder), (2) caregiver notes, and (3) Miyeon's diary. Plaintiff has met her burden to show by a preponderance of the evidence that records were lost or destroyed as none of these records were located when different witnesses visited SHB in 2025.

Plaintiff has also met her burden to show by a preponderance of the evidence that SHB had a duty to preserve the combined resident file and the caregiver notes. Given the investigations that took place after complaints were filed after Ms. Mactier's passing, SHB reasonably should have known the records would be relevant to anticipated litigation. Indeed, the Department of Health and Human Services' report made clear that it was not to be construed to prohibit a civil action. Moreover, Elena Kealoha testified that she had had a specific conversation with Michelle regarding Ms. Mactier the day she took over the business and that she was told it was important to safeguard the records pertaining to Ms. Mactier. Given this, this Court does not need to decide whether NAC 449.2749 triggers the duty to preserve for purposes of a spoliation motion.

Miyeon's diary, where she kept her feelings as to the residents she cared for, were not SHB's—it was hers. There was no duty on the part of SHB to exercise any control over Miyeon's personal diary. The information that Miyeon wrote down on scratch pieces of paper regarding residents' physical condition was verbally reported to Michelle and included in the appropriate file. Of course, the file, as explained above, has been lost or destroyed.

This Court finds there was no bad faith on the part of SHB. The record supports a finding that the records were more likely than not likely disposed of with the furniture at the time of the bed bug infestation—not to deprive the Plaintiff from relying on specific evidence at trial. Instead, Plaintiff has shown by a preponderance of the evidence that SHB was negligent in its failure to preserve these records. SHB was on notice of the need to preserve medical records (as a result of (1) the investigations that took place after Ms. Mactier's passing and (2) Michelle explicitly telling Ms. Kealoha about the importance of these records) and did not take any steps to ensure that the records would be preserved.

Plaintiff is prejudiced by the absence of these records as they are relevant to whether SHB acted negligently. As explained above, there is a gap in the documentation concerning April 19, 2020; the day after Ms. Mactier's fall and the day before she passed away. Miyeon testified that she verbally reported a change in Ms. Mactier's condition. SHB's policies and procedures required that such a change be documented in writing. The record supports a finding that Miyeon communicated Ms. Mactier's change of condition but that the policies and procedures to reduce the change to writing were (a) either not followed or (b) followed but lost and destroyed as no such documentation exists.

This Court recognizes that there is some tension between the parties' positions regarding what additional records SHB would have generated during Ms. Mactier's relatively short stay. SHB contends that, apart from the MAR and any incident reports—both of which have been produced through Infinity—there would have been no additional records. This Court also recognizes that SHB was not providing "healthcare" to Ms. Mactier and that SHB contends that the Department of Health and Human Services found no fault on SHB's part after it conducted its investigation. Nevertheless, SHB's own policies and procedures required its staff to document changes in a resident's condition. Moreover, SHB maintained caregiver notes to record what Michelle described as "important information." Thus, SHB's own practices contemplated the creation of records documenting significant changes in Ms. Mactier's condition.

Moreover, the absence of such relevant records precludes Plaintiff from adducing evidence to defeat Defendant's motion for summary judgment. As stated by Defendant, as things stand, Plaintiff cannot "identify specific wrongful acts or neglect by SHB that caused decedent's passing," "construct a detailed account of the resident's deterioration, the facility's response, and the way the response fell below the standard of care." ECF No. 125 at 13-14.

As already mentioned, there was no intent to harm on the part of SHB—SHB was negligent. As a result, this Court declines to recommend informing the jury that they *must* find that the absence of such records was unfavorable to Defendants. Instead, this Court will enter a jury instruction that SHB destroyed the records and that those records may have been unfavorable to Defendant. Such instruction will allow the jury to properly weigh the credibility of each witness and determine (1)

what needed to be done and (2) what was done as a result of Ms. Mactier's change in condition. Should the witnesses' memories indeed have faded, such jury instruction will allow the jury to determine what weight to assign to SHB's policies and procedures and what, if anything, would have been contained in any such records.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Strike Defendant Sweet Home Belmont's (SHB) Answer or, in the Alternative, for an Adverse Inference Instruction as a Sanction for Spoliation of Evidence (ECF No. 121) is **GRANTED in part and DENIED in part.**

**IT IS FURTHER ORDERED** that this Court will enter a jury instruction that Sweet Home Belmont destroyed the records and that those records may have been unfavorable to Defendant.

DATED this 25th day of September 2026.

BRENDA WEKSLER
UNITED STATES MAGISTRATE JUDGE